**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ADILAO JUAN ORTIZ, *Petitioner-Appellant*, <br><br> v. <br><br> JAMES A. YATES, Warden, *Respondent-Appellee*. | No. 11-56383 <br><br> D.C. No. 2:05-cv-05807-PA-E <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
October 9, 2012—Pasadena, California

Filed December 6, 2012

Before: David M. Ebel[*], Ferdinand F. Fernandez,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Fernandez

---

[*] The Honorable David M. Ebel, Senior Circuit Judge for the U.S. Court
of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel reversed the district court's denial of a habeas corpus petition and remanded for issuance of the writ in a case in which the defendant, who was convicted of willful infliction of corporal injury to his spouse, maintained that he was denied his Sixth Amendment right to confront adverse witnesses when the trial judge precluded him cross-examining his wife as to whether she was afraid to deviate from her initial incriminating statement because of threats allegedly made against her by the prosecutor.

The panel held that the California Court of Appeal's conclusion that the trial court's curtailment did not reach constitutional magnitude was objectively unreasonable. The panel also held that the error, which had a substantial and injurious effect on the verdict, was not harmless.

Judge Fernandez dissented because even if there was a violation of the confrontation clause, he is satisfied the error was harmless.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jerald W. Newton, Sedona, Arizona, for Petitioner-Appellant.

Corey J. Robins, Office of the Attorney General of the State of California, Los Angeles, California, for Respondent-Appellee.

**OPINION**

BERZON, Circuit Judge:

Petitioner Adilao Juan Ortiz ("Ortiz") was convicted by a jury of willful infliction of corporal injury to his spouse in violation of California Penal Code § 273.5. At trial, Ortiz's wife, Miriam Ortiz ("Miriam") testified on behalf of the prosecution. Ortiz maintains that he was denied his Sixth Amendment right to confront adverse witnesses when the trial judge precluded his trial counsel from asking Miriam whether she was afraid to deviate from her initial incriminating statement to the police because of threats allegedly made against her by the prosecutor. The District Court denied Mr. Ortiz's petition for habeas corpus. We reverse.

## I. Factual and Procedural Background

### A. Pre-Trial Proceedings

On February 10, 2001, Miriam, accompanied by her mother, father, and sister, went to the Santa Barbara Police Department to report an alleged assault by her husband the previous evening. There she was interviewed by Officer James Fuller. Miriam, who was four months pregnant at the

time, had severe bruising to her mouth and left eye, and a swollen knee. She represented to Officer Fuller that she received these injuries when her husband punched her in the face and kicked her following an argument about money. Ortiz was subsequently charged with corporal injury to his spouse in violation of California Penal Code § 273.5.

In the months leading up to her husband's trial, however, Miriam would not assist the prosecuting authorities. She declined to speak with District Attorney ("D.A.") investigators, telling them she was "not going to help [them] put [her] husband in jail." The prosecuting attorney, Deputy District Attorney Joshua Lynn, anticipated that if called to testify at any point, Miriam would attempt to "save[]" her husband from conviction.

Miriam also assisted her husband's efforts to disqualify the Santa Barbara County D.A.'s Office from prosecuting his case. Prior to trial, Ortiz moved to disqualify the D.A.'s office, arguing that a conflict-of-interest existed because Miriam's aunt, Sonia Huerta ("Sonia"), worked in that office. To support his motion, Ortiz submitted declarations from Miriam and her father, Martin Huerta ("Martin"). Martin stated that he received a phone call from Sonia, his sister-in-law, nearly two weeks before Ortiz's preliminary hearing. According to Martin, Sonia

> told me that [Deputy D.A. Lynn] asked her to give a message to me and my daughter. Sonia told me that Mr. Lynn said that if Miriam did not tell the truth at the preliminary hearing she could be sent to jail. He said Miriam needed to think about that because she had a baby and

the baby was going to grow up without both
parents.

Martin added that "[t]his sounded like a threat by Mr. Lynn
that Miriam would be punished if she testified at the
preliminary hearing any different from her original
statement." Miriam's sworn declaration stated: "my father
. . . told me that Sonia Huerta had called with a message for
me. . . . The message was that if I didn't testify the same as
my original statement I could go to jail and lose my baby."

Deputy D.A. Lynn submitted a declaration in opposition
to Ortiz's disqualification motion. Lynn admitted that he
spoke with Sonia about Ortiz's case, but maintained that he
told her only that Miriam "was under subpoena for the
preliminary hearing and she needed to appear and testify
truthfully if called."[1] Lynn denied that he instructed Sonia to
pass on a message threatening Miriam with prosecution or
"taking her kids."

The trial court denied Ortiz's motion to disqualify the
D.A.'s office. In doing so, the court assumed the truth of
Martin's and Miriam's declarations but declined to hold an
evidentiary hearing. Issues regarding the alleged threat
would later resurface at trial.

**B. The Trial Evidence**

Ortiz's trial proceedings commenced on October 30,
2002. Following opening statements, Deputy D.A. Lynn

---

[1] Though Miriam was subpoenaed to testify at Ortiz's preliminary
hearing, Lynn did not call her as a witness.

called three witnesses: (1) Gerardo Gonzalez, (2) Miriam Ortiz, and (3) Officer James Fuller.

### 1.  Testimony of Gerardo Gonzalez

Gonzalez testified that in early February 2001, his coworker, Miriam, asked him to cash a $700 check for her because she did not have time to go to the bank.  Gonzalez deposited the check into his account and gave Miriam $700 in cash.  A week later, Gonzalez's bank informed him that the check from Miriam had bounced.  When Gonzalez told Miriam about the problem, she wrote him a second check, which also bounced.

At that point, Gonzalez called Miriam to discuss her $700 debt.  He spoke to Miriam briefly, but at some point during the conversation, a male voice came on the phone and asked Gonzalez who he was.  Gonzalez tried to explain the situation, but the man on the phone accused Gonzalez of having an affair with Miriam, and told him "I'm going to go to your work, [and] I'm going to beat you up."

### 2.  Testimony of Miriam Ortiz and Restriction of her Cross-Examination

### i.   Direct Examination

The morning before Ortiz's trial started, prosecutors agreed to give Miriam use immunity (excluding perjury) to induce her to testify.  Though reluctant, Miriam largely corroborated Gonzalez's testimony with respect to the $700 debt and the subsequent phone conversation.  She denied, however, that Ortiz had threatened to beat up Gonzalez.

According to Miriam, after the phone call, Ortiz was upset with her for borrowing money from Gonzalez. Though she tried to explain to Ortiz that she had borrowed the money to pay off their recent wedding expenses, he called her a "whore" and accused her of having a sexual relationship with Gonzalez. At some point during the argument, Ortiz punched Miriam in the face. Miriam then went into the bedroom to lay down; Ortiz followed and kicked her in the knee.

The following day, Miriam went with her parents and sister to the police station to report the incident. At trial, Miriam testified that she remembered making the report and speaking with Officer Fuller, but that she could not remember certain details about the interview. Miriam explained that she "wasn't feeling [her]self" that day at the police station, "because [her] grandfather had passed away" earlier that morning. She recalled telling Officer Fuller that Ortiz had punched and kicked her. And, although she admitted agreeing to a restraining order against Ortiz, she testified that she "didn't really want to agree to it because [she] didn't feel like [she] needed one."

The prosecutor then admitted into evidence photos of Miriam's injuries that were taken the day she filed the police report. The pictures showed bruising on Miriam's chin, lacerations to her lips, darkness around her eyes, and bruising on her right knee. Although Miriam recalled having the pictures taken, she equivocated when asked whether the injuries were caused by Ortiz.

Finally, the prosecutor asked Miriam if she had spoken with D.A. investigator Jim Nalls about the incident. Miriam stated that Nalls had attempted to speak with her a few weeks before the trial but she had refused to talk to him about the

case. When asked whether she had told Nalls that she received her injuries when she "hit a rocking chair or something along those lines," Miriam said that she could not recall.

### ii. Cross-Examination

Because the principal issue in this appeal concerns the trial court's restriction on Ortiz's ability to cross-examine Miriam, we describe the proceedings in some detail. During cross-examination, the following exchange between Miriam and Thomas Stanley, Ortiz's trial counsel, took place:

>Mr. Stanley: You were asked right at the end of your testimony previously about talking to Investigator Nalls I think three weeks ago, correct?

>Mrs. Ortiz: Yes, that is correct.

>Mr. Stanley: And he interviewed—he wanted to speak to you about what happened, correct?

>Mrs. Ortiz: Yes, that is correct.

>Mr. Stanley: And even though you didn't really want to speak with him, you did speak with him for awhile?

>Mrs. Ortiz: Yes, I did mention to him we were going to go out . . . to dinner with my sister-in-law and her family and he continued to question me, and I mention [sic] to him that I didn't want to talk about it.

Mr. Stanley: Did you have some concerns in talking about it? Had you perceived any sort of danger to your situation?

Mrs. Ortiz: Yes. They've actually—they've threatened me that if I didn't testify—

Deputy District Attorney Lynn: Objection. Move to strike. Counsel—

Mr. Stanley: Goes to her state of mind, your Honor. I think it's entitled to be presented.

The Court: Sustained.

Mr. Stanley: What did you tell Mr. Nalls about why you weren't speaking to him.

Mr. Lynn: Same objection, your Honor. Unless it calls for a separate answer.

Mr. Stanley: Your Honor, I would like to go sidebar. I do want to make this comment.

The Court: The question is what did she say to Mr. Nalls. I'll permit it. What did you say to him?

Mrs. Ortiz: What did I say to him the day that he went to the house?

Mr. Stanley: About why you didn't want to talk to him.

Mrs. Ortiz: Because they had threatened me
that if I didn't—

Mr. Lynn: Same objection.

The Court: I'm going to sustain the objection
if that's the issue.

Mr. Stanley: I would like to make my point at
sidebar with the reporter.

At sidebar, Stanley proffered that Miriam would testify
that she refused to speak with Nalls because she perceived a
threat from the prosecutor's office that if she deviated from
her original statement to Officer Fuller, she would be
prosecuted for perjury and lose custody of her child. Stanley
argued to the trial court that its refusal to allow cross-
examination on this subject violated Ortiz's right to confront
adverse witnesses.

Stanley also reported during the sidebar conference that
Miriam had privately recanted her initial story that Ortiz
assaulted her: at around 1:30 p.m. on October 30—the day
Ortiz's trial commenced—Miriam met privately with her
attorney, Dan Murphy ("Murphy"), whom she had retained
the previous evening. Stanley joined Miriam and Murphy to
help bring Murphy up to speed. According to Stanley,
Miriam represented during that meeting that Ortiz did not
strike her, and that she was afraid she would be prosecuted
for perjury if she testified to that effect.

The trial judge moved the sidebar conversation into
chambers, where Murphy presented a different account of
that earlier three-way meeting. According to Murphy, at

around 11:30 on the morning of October 30, Miriam made it "very clear" to him that her testimony later that afternoon would conform to her initial statement to Officer Fuller. Murphy believed, however, that Miriam was "worked over the noon hour" when she went to lunch with Ortiz. At around 1:30 p.m., during the three-way meeting between Miriam, Murphy, and Stanley, Miriam asked Murphy "[h]ow is anyone going to know what really happened, what's really the truth, when no one was there? It was just me and him." But, Murphy maintained, Miriam never said "[h]e didn't hit me," nor did she otherwise recant the version of events she gave to Officer Fuller.

Still in chambers, Deputy D.A. Lynn reiterated his objection to the proposed line of questioning. He noted that the issue regarding the alleged threat came up months earlier in connection with Ortiz's motion to disqualify, and that there had been no "proof" that Miriam was, in fact, threatened. The trial court sustained Lynn's objection, and suggested that if it allowed Stanley to ask about the perceived threat, it was "at least possible, maybe even probable, that Mr. Murphy [would have] to testify and maybe [Stanley would] have to testify." Lynn commented that he would also likely need to testify on the matter.

### 3. Testimony of Officer James Fuller

Officer Fuller testified that on February 10, 2001 he interviewed Miriam regarding the incident that took place the previous evening. He described Miriam's injuries as they appeared that day, and confirmed that she had told him that she received her injuries when Ortiz punched her. Fuller also provided testimony regarding Miriam's prior statements to him that were inconsistent with her trial testimony. Most

notably, Fuller testified that Miriam "insisted" on an emergency protective order against Ortiz that would cover her father, her mother, and her sister, because Ortiz "threatened if she ever left him, that he would hurt her family."

### C.  The Trial Court's Decision & Post-Trial Rulings

Following the presentation of evidence, the parties stipulated that "[w]ithin four to ten years immediately prior to the crime alleged in this case [Ortiz] was convicted of felony spousal abuse."[2]  The jury found Ortiz guilty of willful infliction of corporal injury to his spouse in violation of California Penal Code § 273.5.  Because Ortiz had four prior serious and violent felony convictions, he received a sentence of twenty-six years to life under California's Three Strikes Law.  *See* Cal. Pen. Code §§ 667, 667.5, 1170.12.

Following his conviction, Ortiz filed a motion for a new trial based on the trial court's restriction of his cross-examination of Miriam.  The trial court denied the motion.

### D.  Direct Appeal

Ortiz appealed his conviction to the California Court of Appeal where he contended, *inter alia*, that the trial court "violated his due process and Sixth Amendment rights by restricting his counsel's cross-examination of the victim." The Court of Appeal agreed that "the trial court erred by refusing to allow defense counsel to cross-examine Miriam as to whether her testimony was influenced by any threat or

---

[2] That conviction, as well as Ortiz's other prior convictions, arose out of an incident in 1991 in which he assaulted a former girlfriend and her roommate.

implied threats of prosecution." In doing so, the court cited California Evidence Code § 780,[3] and emphasized that the proffered cross-examination "bore directly on [Miriam's] credibility as a witness." Nevertheless, the Court of Appeal deemed the trial court's evidentiary error harmless under the state law harmless error standard.[4]

Ortiz next sought review by the California Supreme Court, which denied his petition for review summarily. He then filed a petition for a writ of habeas corpus in the District Court for the Central District of California.

The District Court denied the petition. In the District Court's view, by citing the California Evidence Code and applying the harmless error standard for violations of state law, rather than the one required for constitutional violations, the California Court of Appeal implicitly held that the trial

---

[3] As summarized by the California Court of Appeal, section 780 provides that "in determining the credibility of a witness, the court or jury may consider any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony."

[4] Specifically, in reaching its harmless error conclusion, the California Court of Appeal relied on *People v. Cudjo*, 6 Cal. 4th 585 (1993), and *People v. Watson*, 46 Cal.2d 818 (1956). *Cudjo* stands for the proposition that "for the most part, . . . the mere erroneous exercise of discretion under [California's evidence rules] does not implicate the federal Constitution." 6 Cal. 4th at 611; *Watson* supplies the harmless error standard applied by California appellate courts in reviewing trial errors that do not reach constitutional magnitude, asking whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." 46 Cal.2d at 836. The harmless error standard on direct review of claims of *constitutional* error is whether the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

court committed no constitutional error when it prohibited Ortiz from cross-examining Miriam as to the alleged threat. That implicit holding, the District Court concluded, was not unreasonable, and therefore Ortiz was not entitled to habeas relief. We disagree with the District Court's latter conclusion, and, for the reasons set forth below, grant Ortiz's petition.

## II. Analysis

Ortiz's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214. Although the California Court of Appeal did not explicitly address the trial court's curtailment of cross-examination in constitutional terms, we agree with the District Court that the Court of Appeal implicitly decided the merits of Ortiz's Confrontation Clause claim. The Court of Appeal acknowledged that Ortiz raised this claim in his direct appeal by asserting that the trial court "violated his due process and Sixth Amendment rights by restricting his counsel's cross-examination of the victim," but, by citing *Cudjo*, indicated that in its view the trial court's error did not reach constitutional magnitude. AEDPA therefore properly applies. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

Under AEDPA, a federal habeas court may grant a habeas petition if the state court's adjudication of the merits of the petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In making this determination, we look through state-court summary denials to the last reasoned state-court opinion on the claim at issue—here, the California Court of Appeal's decision

affirming Ortiz's conviction.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804–06 (1991); *see also Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007) (en banc).

### A.  The Sixth Amendment Violation

In the District Court's view, it was not objectively unreasonable for the California Court of Appeal to conclude that the trial court committed no constitutional error when it precluded Ortiz from cross-examining Miriam as to the perceived threat.  We disagree.

The Supreme Court has made clear that "'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'"  *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986) (quoting *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974)).  To that end,

> a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

*Id.* at 680 (quoting *Davis*, 415 U.S. at 318).

To be sure, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose *reasonable* limits on such cross-examination based on concerns about,

among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 679 (emphasis added). Any such "[r]estrictions on a criminal defendant's rights to confront adverse witnesses," however, "'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)); *see Chambers v. Mississippi*, 410 U.S. 284, 295 (1973). Accordingly, a trial court may not "prohibit[] *all* inquiry into the possibility that [a witness] would be biased" without raising serious constitutional questions. *Van Arsdall*, 475 U.S. at 680.

We have on several occasions applied *Lucas* to hold that an arbitrary or disproportionate restriction on a defendant's ability to cross-examine adverse witnesses as to their biases or motives for testifying violates the Sixth Amendment. *See Jackson v. Nevada*, 688 F.3d 1091, 1101–04 (9th Cir. 2012) (holding that a trial court's restriction on a habeas petitioner's cross-examination of police officers regarding the victim's prior unsubstantiated claims of assault was both contrary to and an unreasonable application of *Lucas*); *Holley v. Yarborough*, 568 F.3d 1091, 1099 (9th Cir. 2009) ("The trial court's decision to completely limit [the witness'] cross-examination to exclude any testimony regarding [bias] . . . was both unreasonable and disproportionate."); *Fowler v. Sacramento Cnty. Sheriff's Dep't*, 421 F.3d 1027, 1038 (9th Cir. 2005) (holding that the trial court's ruling precluding defendant from cross-examining the victim regarding prior exaggerated allegations of molestation was an unreasonable application of *Lucas*); *cf. LaJoie v. Thompson*, 217 F.3d 663 (9th Cir. 2000).

As those cases instruct, determining "whether the trial court's preclusion of the cross-examination was an objectively unreasonable application of [*Lucas*]," involves a two-part inquiry. *Fowler*, 421 F.3d at 1038. First, we ask "whether the proffered cross-examination sufficiently bore upon [the witness'] reliability or credibility such that a jury might reasonably have questioned it." *Id.*; *see also Jackson*, 688 F.3d at 1099. If so, we consider "whether the trial court's preclusion of this cross examination was unreasonable, arbitrary or disproportionate" in light of any "countervailing interests" justifying preclusion, such as "waste of time, confusion and prejudice." *Fowler*, 421 F.3d at 1038, 1040; *Jackson*, 688 F.3d at 1100 n.6, 1103–04.

As in *Fowler*, the Court of Appeal in Ortiz's case did not rely on, or even cite, *Lucas* in reaching its conclusion. *See id.* However, "a state court need not cite or even be aware of [the Supreme Court's] cases under § 2254(d)." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) (citing *Early*, 537 U.S. at 8). In such circumstances, "a habeas court must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786; *see also Miles v. Martel*, 696 F.3d 889, 898 (9th Cir. 2012).

Accordingly, to determine whether § 2254(d)(1) is satisfied, we must decide (1) whether Ortiz's proffered cross-examination sufficiently bore upon Miriam's credibility such that no fairminded jurist could disagree that the cross-examination could have influenced the jury's assessment of her; and (2) whether any countervailing interests could

reasonably have justified the trial court's curtailment of cross-examination.

As to the first inquiry, we previously explained that "cross-examination may implicate the Sixth Amendment even if it is not certain to affect the jury's assessment of the witness's reliability or credibility. . . . [I]t is sufficient that a jury 'might reasonably' have questioned the witness's reliability or credibility in light of the cross-examination." *Fowler*, 421 F.3d at 1036 (quoting *Van Arsdall*, 475 U.S. at 679). Here, the jury might well have questioned Miriam's credibility had Ortiz been permitted to elicit testimony that she was afraid to deviate from her original statement to Officer Fowler for fear of prosecution or of losing custody of her child.[5] *Cf. United States v. Vavages*, 151 F.3d 1185 (9th Cir. 1998) (holding that the defendant's Sixth Amendment rights were violated when a defense witness refused to testify because the prosecutor threatened her with perjury if she testified in support of defendant's alibi); *Webb v. Texas*, 409 U.S. 95, 97–98 (1972) (per curiam) (holding that the defendant's Sixth Amendment rights were violated when the trial judge "gratuitously" admonished a single witness "on the dangers of perjury," causing the witness to refuse to testify).

As the victim and sole eyewitness to the incident, Miriam was a "central, indeed crucial" witness for the prosecution. *Olden v. Kentucky*, 488 U.S. 227, 232–33 (1988) (per curiam). Although the prosecution introduced photographic

---

[5] Whether the District Attorney's office did, in fact, threaten to prosecute Miriam for perjury, or to take away her child, if she testified differently from her initial statement is largely beside the point. It was Miriam's *understanding* that she was threatened that was relevant to her motivation for testifying against Ortiz.

evidence of Miriam's injuries, only Miriam's statement to Officer Fuller and her direct testimony linked Ortiz to those injuries. Her motive for testifying, therefore, was not of "marginal relevance"—it bore directly on the likelihood that the jury would credit essential testimony by the primary witness. *See Jackson*, 688 F.3d at 1100.

Moreover, without any testimony regarding the perceived threat, jurors had no reason to question Miriam's reasons for testifying against her husband. They therefore lacked "sufficient information to appraise [Miriam's] biases and motivations." *Hayes v. Ayers*, 632 F.3d 500, 518 (9th Cir. 2011) (citation and internal quotation marks omitted). Had the jury heard Miriam's testimony about the perceived threat, it might reasonably have questioned her commitment to her initial story.

That conclusion brings us to the second inquiry: whether the trial court's evidentiary restriction "was disproportionate to the interests served in light of the facts of the defendant's case." *Jackson*, 688 F.3d at 1103. As noted earlier, trial courts may limit cross-examination for a number of reasons, including confusion of the issues, prejudice, and undue delay. *See Van Arsdall*, 475 U.S. at 679; *Fowler*, 421 F.3d at 1038. Here, the Court of Appeal's decision—the "last reasoned state-court opinion" for purposes of § 2254(d)—concluded that the failure to permit the cross-examination was state law evidentiary error, and so contains no discussion as to what interests, if any, justified the trial court's restriction on cross-examination. Nor is it clear what countervailing interests *could have* justified the trial court's categorical preclusion of Ortiz's proffered cross-examination. *See Richter*, 131 S. Ct. at 784.

The District Court, in denying Ortiz's habeas petition, indicated that "[t]he trial court concluded that admitting evidence of the alleged threats would be both highly prejudicial and an undue waste of time." Not so.

The trial court said nothing about prejudice when it precluded Ortiz from cross-examining Miriam as to the perceived threat. Nor did the Court of Appeal cite prejudice as a reason for concluding that the trial court committed no constitutional error.

In any event, it is difficult to see how the proffered cross-examination could have been impermissibly prejudicial to the State. Had the trial court permitted Ortiz's counsel to question Miriam about the perceived threat, prosecutors would have been free to rebut any statements Miriam might have made—for example, by offering evidence that no such threat was made in the first place. And, of course, prejudice in the sense of making the jury less likely to convict because it does not believe the witness' account is not, standing alone, pertinent to the question whether cross-examination should have been allowed. The whole point of the effective, permissible cross-examination protected by the Confrontation Clause is to diminish the witness' credibility with the jury and thereby render a conviction less likely.

Any concerns about delay likewise could not have justified the trial court's decision to preclude Ortiz from eliciting any testimony whatsoever from Miriam regarding the perceived threat. According to the trial court, permitting cross-examination of Miriam as to the threat might have required further testimony from several of the lawyers involved in Ortiz's case. To be sure, whether the presentation of evidence would be unduly time consuming is a legitimate

concern trial courts may consider in determining whether preclusion of cross-examination is warranted. *See, e.g.*, *Fenenbock v. Dir. of Corr. for Cal.*, 692 F.3d 910, 920 (9th Cir. 2012). And we have rejected Confrontation Clause challenges to narrow evidentiary restrictions that specifically address concerns about delay. *See id.* (denying habeas relief because the state court's *time*-limitation on cross-examination did not disproportionately limit the *subject matter* of the witness' testimony). Here, however, the "complete exclusion of the relevant testimony was disproportionate to th[at] limited interest[]." *Jackson*, 688 F.3d at 1102.

Moreover, the potential for delay was actually quite limited. Our Confrontation Clause analysis is limited to the proffered threat testimony, and does not encompass Miriam's purported recantation.[6] The only lawyer who possibly could have provided relevant testimony regarding the threat, as opposed to the purported recantation, was Deputy D.A. Lynn—the prosecutor who purportedly "sent" the alleged threat; the other lawyers' testimony would not have been pertinent to that inquiry. That testimony from Lynn might have been necessary had Ortiz been allowed to ask Miriam about the threat cannot justify the trial court's curtailment of cross-examination.

As a general matter, a witness may not be contradicted by extrinsic evidence on a collateral matter. *See, e.g.*, *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 (9th Cir. 2009) ("When impeaching by contradiction, the fact to be contradicted must be material.") (citing 4 Joseph M. McLaughlin, Weinstein's Federal Evidence, § 608.20 [3] [a],

---

[6] As discussed below, Ortiz was free to ask Miriam on cross-examination whether she received her injuries some other way.

at 608–38 (2d ed. 1999)); *Herzog v. United States*, 226 F.2d 561, 565 (9th Cir. 1955) *adhered to on reh'g*, 235 F.2d 664 (9th Cir. 1956) ("A witness cannot be impeached where the subject matter of his testimony is either immaterial or collateral to the issues in the cause in which the testimony is given."); *People v. McCarthy*, 88 Cal. App. 2d 883, 889 (1948) (noting that "it is well settled" that "a witness cannot be impeached on an immaterial or collateral matter"). As noted, it is only peripherally relevant what the "message" Lynn communicated to Miriam actually was.[7] Although Martin, Miriam, and Lynn all provided different accounts of that message,[8] Miriam could have (quite possibly accurately) inferred a message that went beyond what was explicitly said.

In any event, even if the trial would have been slightly longer with Lynn's testimony, that is the price of assuring accurate decisionmaking. Put another way, where, as here, cross-examination is potentially crucial, the possibility of a somewhat longer trial is simply the price of the protection accorded by the Confrontation Clause.

We cannot discern—and the State does not suggest—any other countervailing interest that would justify the trial court's decision to preclude the proffered cross-examination. Put simply, the trial court's curtailment was disproportionate to any conceivable valid purpose. Without Miriam's testimony about the perceived threat, the jury had no reason to question why Miriam testified as she did during her direct examination. This error violated Ortiz's constitutional right

---

[7] *See supra* note 5.

[8] *See supra* pp. 4–5.

of confrontation; the Court of Appeal's ruling to the contrary was objectively unreasonable.

## B. Harmless Error

"Even where constitutional error is found, 'in § 2254 proceedings a court must [also] assess the prejudicial impact of constitutional error' under the *Brecht* standard."**[9]** *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quoting *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007)); *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993). Under that standard, "[h]abeas relief is warranted only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Brecht*, 507 U.S. at 637–38). "If a habeas court is left with 'grave doubt' about whether a constitutional error substantially influenced the verdict, then the error was not harmless." *Parle v. Runnels*, 387 F.3d 1030, 1044 (9th Cir. 2004).

Where there has been a Confrontation Clause violation, "[t]o guide an analysis of 'substantial and injurious effect,' this court has applied the five non-exclusive factors propagated by the Supreme Court in *Delaware v. Van Arsdall*." *Merolillo*, 663 F.3d at 454; *see also Fowler*,

---

**[9]** It is immaterial that the California Court of Appeal applied the nonconstitutional, more-likely-than-not harmless error standard in Ortiz's direct appeal. When a state appellate court chooses between harmless error standards to assess the prejudicial impact of a nonstructural constitutional error, "'we need not conduct an analysis under AEDPA of whether the state court's harmlessness determination on direct review . . . was contrary to or an unreasonable application of clearly established federal law.'" *Merolillo*, 663 F.3d at 455 (quoting *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010)). Instead, "the *Brecht* 'substantial and injurious effect' standard governs our harmless error review." *Id.*

421 F.3d at 1041–42. Those factors are: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the witness' testimony on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Van Arsdall* 475 U.S. at 684. Applying these factors, and "assum[ing]"—as we must—"that the damaging potential of the [precluded] cross-examination [would otherwise have been] fully realized," we conclude that the trial court's restriction on Ortiz's ability to cross-examine Miriam had a substantial and injurious effect on the jury's verdict. *See Fowler*, 421 F.3d at 1041 (quoting *Van Arsdall*, 465 U.S. at 684) (alterations in original).

It is difficult to overstate the importance of Miriam's testimony for the prosecution. As the victim and sole eyewitness to the assault, Miriam provided the only direct evidence linking Ortiz to her injuries. As discussed above, "the jury might have received a 'significantly different impression' of [Miriam's] credibility" had Ortiz been permitted to elicit testimony about the perceived threat. *Holley*, 568 F.3d at 1101. With Miriam's credibility as a witness in doubt, the jury might also have questioned the accuracy of the statements she made to Office Fuller. Critically, the remaining evidence against Ortiz—Gonzalez's testimony and the police station photos—said nothing about the *cause* of Miriam's injuries. The prosecution's case against Ortiz, in other words, was hardly overwhelming. It turned almost entirely on what Miriam said on the witness stand about the night of the alleged incident, and whether the jury found that story credible. Having no reason to question why Miriam testified consistently with her initial statement to the police, the jury understandably credited the one version

of events it was told. Exposing Miriam's potential ulterior motives for parroting her initial statement to the police would have undermined the prosecution's case against Ortiz. Because we must assume the "damaging potential" of Ortiz's proffered cross-examination would have been "fully realized," *Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009), we are in grave doubt as to whether the trial court's error affected the verdict.

That Ortiz was permitted to cross-examine Miriam on other matters does not alter our conclusion. Ortiz's ability to cross-examine Miriam regarding a prior miscarriage, Ortiz's relationships with her relatives, and Miriam's emotional state on the day she filed the police report, could not have substituted for the precluded cross-examination regarding the threat. What is more, while Ortiz was free to ask Miriam on cross-examination whether she had received her injuries some other way—by falling over a chair, for example[10]—there is no reason to believe that line of inquiry would have been helpful to him, standing alone. So long as Miriam felt compelled to hold to her original story or otherwise face possible prosecution and lose custody of her child, it is doubtful that she would have deviated from that story. Furthermore, even if Miriam *had* deviated from her direct examination testimony, because of the trial court's curtailment, Ortiz could not have adequately explained to the jury why she had initially testified to the contrary.

Similarly, the trial court's constitutional error is not rendered harmless simply because Miriam may have lacked credibility as a witness in other respects. The State points out that Miriam's reluctance to testify on behalf of the

---

[10] *See supra* p.8.

prosecution was obvious: she had difficulty remembering the details of what had happened, could not recall her own prior statements, and gave implausible explanations for her injuries. But Miriam's occasionally hesitant responses to questions do not support a finding of harmlessness. Quite the opposite: because the jury never heard about the perceived threat, it lacked any explanation for Miriam's reluctance other than the one supplied by the prosecutors—that Miriam wanted to "save" Ortiz from conviction even though he had attacked her as she described. Had Ortiz been permitted to ask Miriam about the threat, the jury would have had an alternative explanation for her hesitant demeanor.

Our balancing of the *Van Arsdall* factors might suggest a different result had the prosecution supplied further evidence of Ortiz's guilt beyond the three witnesses' testimony and the police station photos. But it did not do so. The preclusion of Ortiz's proffered cross-examination of the State's key witness was therefore not harmless, and Ortiz is entitled to habeas relief.

## III.    Conclusion

"Clearly established federal law, as set forth by the Supreme Court in *Davis*, *Van Arsdall*, and *Lucas*, indicates that the trial court committed constitutional error by denying [Ortiz] the right to meaningful cross-examination of the prosecution's leading witness." *Holley*, 568 F.3d at 1101–02. The California Court of Appeal's conclusion that the trial court's curtailment did not reach constitutional magnitude was objectively unreasonable, and had a substantial and

injurious effect on Ortiz's verdict. We therefore reverse the judgment of the District Court and remand for issuance of the writ.

**REVERSED and REMANDED.**

FERNANDEZ, Circuit Judge, dissenting:

I respectfully dissent because even if there was a violation of the confrontation clause, a question on which I do not opine, habeas corpus relief cannot issue unless that constitutional violation had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 1714, 123 L. Ed. 2d 353 (1993). Otherwise, the error was harmless. *Id.* In making a determination, I will apply the harmless error considerations that have been delineated by the Supreme Court for confrontation clause purposes. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L. Ed. 2d 674 (1986); *United States v. Miguel*, 111 F.3d 666, 671–72 (9th Cir. 1997). I do so because this is not a case where all cross-examination of the witness was precluded;[1] although cross-examination was limited in one respect, it was otherwise permitted.[2] Thus, I will assume that "the damaging potential of the cross-examination [was] fully realized" and then go on to determine whether I "might nonetheless say that the error was harmless . . . ." *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438. That "depends

---

[1] *See Miguel*, 111 F.3d at 672 n.3.

[2] *See United States v. Schoneberg*, 396 F.3d 1036, 1044 (9th Cir. 2005); *Miguel*, 111 F.3d at 672 n.3.

upon a host of factors . . . ." *Id.* As the Supreme Court pointed out:

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* In this case, I am satisfied that the error was harmless.

Ortiz's wife, Miriam, was the witness. She presented herself in apparently battered condition at a police station the day after Ortiz allegedly assaulted her, and sought an order protecting herself and her family from Ortiz and his threats. Thereafter, however, she indicated that she just wanted to lead a normal life with her husband and child. At trial, Miriam testified that Ortiz had hit her and kicked her, but she had many claimed memory failures about the incident and made various statements in which she attempted to soften the effect of that testimony. She even seemed to take some of the blame upon herself. Moreover, she suggested that other witnesses were incorrect, or that she could not recall what she told them. All in all, it was clear that she was a reluctant witness, who wanted to protect Ortiz despite his behavior. The jurors could readily perceive that.

The jury also heard from Gerardo Gonzalez, the man whose phone call apparently put Ortiz into a rage. When Gonzalez called, Miriam began crying and Ortiz came on the

line, accused Gonzalez of having an affair with Miriam, and threatened to assault him. After that call, he hurled similar accusations at her. The assaults upon Miriam took place right after that. Officer Fuller testified to what Miriam had told him, and to what he saw and photographed (the photographs were shown to the jury). In addition, the jury was informed that Ortiz had a prior conviction for spousal abuse. Ortiz, himself, did not testify.

Ortiz was not precluded from cross-examining Miriam about her changing stories or on any other point other than her claim that she felt threatened with a perjury prosecution if she testified that she had not really been assaulted by Ortiz. (Whether she was actually threatened and whether she would have recanted is not directly before us.)

In light of what the jury did hear, that is, the evidence given by the independent witness regarding the anger of and threats by Ortiz, a prior batterer, and the condition and statements of Miriam when she appeared at the police station with her family, including her desire for a restraining order, it is highly unlikely that the jury would have been much moved if she had been subjected to the further cross-examination propounded by Ortiz.[3] In fact, the evidence that she had been battered by Ortiz was "strong"[4]; it is doubtful that the jury's decision would have been "much more difficult"[5] if it had heard a different story from her when she

---

[3] While Miriam's testimony had importance, it was well corroborated on material points and cross-examination was not otherwise restricted.

[4] *United States v. Larson*, 495 F.3d 1094, 1108 (9th Cir. 2007) (en banc).

[5] *Slovik v. Yates*, 556 F.3d 747, 756 (9th Cir. 2009).

was on the witness stand.  In short, giving the proposed cross-examination evidence its full damaging potential, in my opinion any error was harmless.

Thus, I respectfully dissent.