**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ORLANDO S. BURGOS, | No. 20-55816 |
| *Petitioner-Appellant*, | D.C. No. 2:17-cv-00179-SVW-SP |
| v. | |
| RAYMOND MADDEN, Warden, | |
| *Respondent-Appellee*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted June 5, 2023
Pasadena, California

Filed August 25, 2023

Before: MILAN D. SMITH, JR., DAVID F.
HAMILTON,[*] and DANIEL P. COLLINS Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable David F. Hamilton, United States Circuit Judge for the U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

## SUMMARY**

### Habeas Corpus

The panel affirmed the district court's denial of Orlando Burgos's 28 U.S.C. § 2254 habeas corpus petition challenging his California conviction for making criminal threats and assault with a deadly weapon.

The victim, Martin Moya Lopez, was not authorized to reside in the United States at the time of the crimes. Prior to testifying in Burgos's trial, Moya received a U-Visa, which provides immigration benefits for victims of certain crimes who cooperate with law enforcement. At trial, the court barred Burgos from cross-examining Moya about his U-Visa status, which Burgos asserted was relevant to Moya's credibility. The California Court of Appeal determined that the trial court violated the Confrontation Clause by precluding the cross-examination, but the error was harmless because the time-lapse between when Moya reported the crimes and when he applied for the U-Visa rendered any inference that his account was intended to bolster his application for temporary residence in the United States speculative at best.

Under the standard prescribed in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which requires a habeas petitioner to persuade the court that a constitutional error at trial had a "substantial and injurious effect or influence" on the verdict, the panel held that Burgos is not entitled to habeas relief. The panel wrote that nothing in the record indicates

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that Moya had an eye toward immigration benefits when he made his initial statement implicating Burgos; rather, the record suggests the opposite. The panel therefore did not harbor the requisite "grave doubt" that the jury would have convicted Burgos had it known about Moya's immigration status.

## COUNSEL

Dale F. Ogden, Jr. (argued) and Michael D. Weinstein, Assistant Federal Public Defenders; Cuauhtemoc Ortega, Federal Public Defender; Mara Gonzales-Souto and Justin Van Ligten, Certified Law Students; Federal Public Defender's Office, Los Angeles, California, for Petitioner-Appellant.

Julie A. Harris (argued), Deputy Attorney General; Kenneth C. Byrne, Supervising Deputy Attorney General; Susan S. Pithey, Senior Assistant Attorney General, Lance E. Winters, Chief Assistant Attorney General; Rob Bonta, California Attorney General; California Attorney General's Office, Los Angeles, California, for Respondent-Appellee.

## OPINION

M. SMITH, Circuit Judge:

Orlando Burgos appeals the denial of his 28 U.S.C. § 2254 habeas petition. Burgos was convicted in California state court of making criminal threats and assault with a deadly weapon. The victim, Martin Moya Lopez, was not authorized to reside in the United States at the time of the crimes. Prior to testifying in Burgos's trial, Moya received a U-Visa, which provides immigration benefits for victims of certain crimes who cooperate with law enforcement. At trial, the court barred Burgos from cross-examining Moya about his U-Visa status, which Burgos asserted was relevant to Moya's credibility. The California Court of Appeal determined that the trial court erred by precluding the cross-examination, but the error was harmless because the time-lapse between when Moya reported the crimes and when he applied for the U-Visa "render[ed] any inference that his account was intended to bolster his application for temporary residence in the United States speculative at best." Burgos filed this habeas action in federal district court, and his petition was denied. Under the lenient standard prescribed in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), we hold that Burgos is not entitled to habeas relief.

## BACKGROUND

This case arises from a string of criminal incidents that occurred in January 2012, only one of which directly involved the petitioner.[1] In late 2011, Martin Moya Lopez

---

[1] This abbreviated version of the underlying facts is based on the statement of facts set forth by the California Court of Appeal, which is

and his common-law wife Gloria Abarques allowed a woman named Maya Hermosillo to live with them in their home in Panorama City, California. Hermosillo introduced Moya and Abarques to Edward Zuniga, a local gang member and Burgos's eventual co-defendant. Soon thereafter, Zuniga brought a used car to Moya and Abarques's home and tried to sell it to them. They declined, but Zuniga would not take no for an answer. He told them they owed him $800 for the car and left it in front of their house for over a week.

Then, on the evening of January 6, 2012, Hermosillo, Zuniga, and a few others robbed Moya and Abarques's home. Abarques was home alone during the robbery. When Moya arrived home later that night, he saw people removing items from the house, and decided to stay with his uncle for the night.

The next morning, Moya was kidnapped from his uncle's house. Hermosillo and three men took Moya to a garage where a group of ten people, including Burgos, were waiting. Burgos forced Moya to the ground, hit him in the head and back, and threatened him with a gun. At some point, Zuniga arrived at the garage and told Moya that he now owed him double for the car and needed to pay within twenty-four hours. A few days later, Moya went to his uncle to borrow money to pay Zuniga. While Moya was at his uncle's house, Zuniga showed up, demanded payment, and hit Moya across the face with the flat side of a knife.

On January 9, Abarques reported the entire matter to the police. On January 23, LAPD Detective Manuel Armijo interviewed Abarques and Moya about the robbery, Moya's

---

presumed correct. *See* 28 U.S.C. § 2254(e)(1); *Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

kidnapping, and his subsequent assault by Zuniga. Burgos and Zuniga were later charged with several crimes related to the incidents.

Sometime after January 23, 2012, the government placed an immigration hold on Moya, who was undocumented, and he voluntarily left the United States for Mexico. On October 18, 2012, Moya was paroled back into the United States and received U-Visa immigration status, which is available to victims of certain crimes who help law enforcement.[2] In a declaration accompanying his application, he stated: "I am applying for a U-Visa based on the horrific kidnapping, extortion, and felonious assault I fell victim to on or about January 7, 2012," and provided details about the crimes.

At Burgos and Zuniga's pretrial hearing, defense counsel argued that they should be permitted to raise Moya's U-Visa status for impeachment purposes, asserting its relevance to Moya's credibility. The court ruled that the defense could ask Moya about any inconsistencies between his U-Visa declaration and his testimony but could not refer to his immigration status.

At trial, Moya was the only witness to directly implicate Burgos in the crimes. Moya was subject to cross-examination regarding his initial statement to Detective Armijo (though the statements in Moya's U-Visa declaration were not introduced). Moya's testimony was largely

---

[2] A U-Visa is a "nonimmigrant status" that is "is set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity." *See* USCIS, Victims of Criminal Activity: U Nonimmigrant Status (2023), https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status.

consistent with the story he told Detective Armijo, though a few discrepancies were revealed—namely, the exact date of the kidnapping, whether he was taken from his uncle's house near a park or from the park itself, and whether Burgos was in the vehicle that took him to the garage. The jury credited Moya's testimony, and Burgos was convicted of making criminal threats pursuant to Cal. Penal Code § 422(a) and assault with a firearm pursuant to Cal. Penal Code § 245(a)(2).

On direct appeal, Burgos argued that the trial court unconstitutionally prevented him from cross-examining Moya about his immigration status. The California Court of Appeal (CCA) concluded that the trial court violated the Confrontation Clause by restricting cross-examination because Moya's U-Visa was "relevant to show motive and/or bias, and was relevant to his credibility," but that the error was harmless beyond a reasonable doubt. The CCA emphasized that more than eight months had passed between when Moya reported the crime and when he applied for a U-Visa, "rendering any inference that his account was intended to bolster his application for temporary residence in the United States speculative at best." The California Supreme Court denied review.

Burgos filed this habeas action in the Central District of California, challenging the CCA's harmless determination. The district court denied the petition, finding the CCA's harmlessness determination was not unreasonable because "the inference of motive or bias was largely negated by the fact that Moya reported the crimes eight months prior to filing a U-Visa application." We granted a certificate of appealability.

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.  We review a district court's denial of a 28 U.S.C. § 2254 petition de novo.  *Bolin v. Davis*, 13 F.4th 797, 804 (9th Cir. 2021).

Burgos's habeas claim is subject to both the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), and *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  "[A] federal court must deny relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents [including *Brecht*] or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests." *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022).

Pursuant to AEDPA, a habeas petitioner cannot obtain relief unless the state court's decision is (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Pursuant to *Brecht*, we cannot grant relief unless the constitutional error had a "substantial and injurious effect or influence" on the verdict.  507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

**ANALYSIS**

**I**

The Confrontation Clause protects a defendant's right to impeach a witness against him by "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives." *Davis v. Alaska*, 415 U.S. 308, 316

(1974). Confrontation Clause errors are subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Once a reviewing court has determined that the preclusion of cross-examination was constitutional error, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* Whether a Confrontation Clause error is harmless "depends upon a host of factors, . . . includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Id.*

The parties dispute whether the CCA reasonably applied *Van Arsdall*'s harmlessness framework. We need not decide that question, however, because Burgos has failed to carry his burden under *Brecht*. *See Davenport*, 142 S. Ct. at 1524.

## II

*Brecht* requires a habeas petitioner to persuade the court that a constitutional error at trial had a "substantial and injurious effect or influence" on the verdict. 507 U.S. at 623. An error has such an effect or influence if it leaves the habeas court in "'grave doubt'—not absolute certainty—about whether the trial error affected the verdict's outcome." *Davenport*, 142 S. Ct. at 1525 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)); *see also Sessoms v. Grounds*, 776 F.3d 615, 630 (9th Cir. 2015) (describing the *Brecht* inquiry as whether the reviewing court "can fairly determine that

[the constitutional error] did not substantially sway the jury to convict").

In this case, the question is whether we harbor "grave doubt" that the jury would have convicted Burgos were he permitted to cross-examine Moya about the immigration benefit he received as a cooperating witness. We have no such doubt.

Burgos asserts that, if members of the jury heard testimony about Moya's U-Visa application, they may have inferred that Moya was lying or exaggerating his account in order to get immigration benefits. But as the CCA reasoned, the time-lapse between Moya's first report of the crimes and his U-Visa application significantly undermines this theory. Moya was locked into his story as of January 2012 when he made his initial statement to Detective Armijo. Indeed, Moya was cross-examined at trial with his January 2012 statement, and despite a few discrepancies, the jury found Moya's story consistent enough to convict. Accordingly, Moya's U-Visa application would be relevant to his credibility only if the jury believed that Moya was aware of (and motivated by) the prospect of obtaining U-Visa status when he made his statement in January 2012.

In our view, nothing in the record indicates that Moya had an eye toward immigration benefits when he made his initial statement implicating Burgos. Rather, the record suggests the opposite. Moya first spoke to Detective Armijo on January 23, 2012, but did not apply for U-Visa status until October 18, 2012—almost nine months later. If Moya had lied or exaggerated his story to qualify for a U-Visa, it seems unlikely he would have waited so long to file an application. Indeed, after Moya spoke with Detective Armijo, an

immigration hold was placed on Moya, and he was removed to Mexico without seeking immigration relief.

Moreover, at Burgos and Zuniga's preliminary hearing outside the presence of the jury, the defense was permitted to ask Moya about his U-Visa, and Moya made several statements casting doubt on the defense's theory that he reported the crimes to obtain immigration benefits. He explicitly denied knowing that U-Visa status would allow him to remain in the United States after trial. He stated that he assumed that after testifying, he would be returned to Mexico.[3] He also stated that, if his goal was to remain in the United States lawfully, he would have legally married Abarques, a US citizen.

In response, Burgos asserts that there are other plausible explanations for why Moya waited to file his U-Visa application. Specifically, he notes that Moya left the United States for Mexico after the incident and may have had limited access to legal resources while in Mexico. But this is wholly speculative given the record before us. At bottom, there is nothing to suggest that Moya was motivated by the prospect of immigration benefits when he made his initial statement about the crimes, which the jury found to be sufficiently consistent with his testimony at trial. Accordingly, is it not likely that cross-examination about Moya's U-Visa would have "substantially sway[ed] the jury." *Sessoms*, 776 F.3d at 630.

---

[3] Moya's assumption was incorrect—U-Visa recipients are authorized to remain in the United States for up to four years and may apply for adjustment of status during that time. *See* USCIS, Victims of Criminal Activity: U Nonimmigrant Status (2023), https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status.

Nevertheless, Burgos argues that we must find prejudice because Moya's testimony was essential to the government's case. It is true that Moya was the only witness to testify directly to Burgos's involvement in the crimes,[4] and there was no physical evidence implicating Burgos. As the prosecution stated in closing, "the elephant in the room" was whether the jury believed Moya.

Indeed, in cases involving restrictions on the cross-examination of the sole witness in a case, we have sometimes found prejudice under *Brecht. See e.g.*, *Ortiz v. Yates*, 704 F.3d 1026, 1039–40 (9th Cir. 2012) (finding actual prejudice when defense was prevented from cross-examining "victim and sole eyewitness . . . [who] provided the only direct evidence linking [defendant] to her injuries" about her "potential ulterior motives"); *Holley v. Yarborough*, 568 F.3d 1091, 1099–1000 (9th Cir. 2009) (finding prejudice when defense was not permitted to cross-examine victim and sole witness about previous statements assertedly evincing her propensity to exaggerate); *see also Van Arsdall*, 475 U.S at 684 (listing "the importance of the witness' testimony" and "whether the testimony is cumulative" as factors relevant to harmlessness). However, for the reasons explained above, the proffered cross-examination about Moya's U-Visa was unlikely to have any material impact on whether the jury believed his story, regardless of whether he was the sole witness. While the importance of Moya's testimony to the prosecution's case weighs in Burgos's favor, it does not compel a finding of prejudice in the context of this case.

---

[4] Although Moya was the only witness to testify directly to Burgos's involvement, other aspects of his testimony were largely corroborated by Abarques.

Finally, Burgos points out that, in closing, the prosecution emphasized that the victims "are receiving no benefit from telling the[ir] story" and "get nothing in return for testifying," which he contends supports a finding of prejudice. We do not condone the government's conduct—this statement, as applied to Moya, is patently false. However, it is not enough to meet Burgos's burden under *Brecht* when, as discussed above, the chances that the precluded cross-examination would have undermined Moya's credibility are so low. On this record, we do not harbor "grave doubt" that the jury would have convicted Burgos had it known about Moya's immigration status. *Davenport*, 142 S. Ct. at 1525.

## CONCLUSION

For these reasons, the district court's decision denying Burgos's petition is **AFFIRMED.** [5]

---

[5] Burgos's Motion to Expand the Record Pursuant to Federal Rule of Appellate Procedure 10(e)(2), or for Judicial Notice Pursuant to Federal Rule of Evidence 201(b)(2), Dkt. No. 28, is **DENIED** as moot. Burgos requests the court to consider the contents of the declaration attached to his U-Visa application. The parties dispute whether the cited procedural rules permit us to consider the document, given that it was not part of the record before the district court. However, our decision does not rely on the contents of Moya's declaration, other than the description contained in the CCA's statement of facts, which is presumed correct. *See* 28 U.S.C. § 2254(e)(1). Therefore, the motion is moot.