ORDER ACCEPTING FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE
OTIS D. WRIGHT, II, UNITED STATES DISTRICT JUDGE
Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition for Writ of Habeas Corpus, records on file and the Report and Recommendation of United States Magistrate Judge. Further, the Court has engaged in a de novo review of those portions of the Report to which Petitioner has objected. The Court accepts the findings and recommendation of the Magistrate Judge.
IT THEREFORE IS ORDERED that Judgment be entered (1) denying the Petition; and (2) dismissing the action with prejudice.
REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
ALEXANDER F. MacKINNON, UNITED STATES MAGISTRATE JUDGE
This Report and Recommendation is submitted to the Honorable Otis D. Wright, II, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.
INTRODUCTION
Petitioner faced charges of human trafficking. Pursuant to California law enacted to protect victims of human trafficking, the trial court precluded Petitioner from cross-examining the two victims about their history of prostitution prior to meeting Petitioner. ( Cal. Evid. Code § 1161(b).) Petitioner contends that this restriction on cross-examination deprived him of his rights under the Confrontation Clause of the Sixth Amendment. For the following reasons, Petitioner is not entitled to relief under either AEDPA's deferential review or de novo review.
*891 PROCEDURAL BACKGROUND
Petitioner was charged with pandering by procuring, pimping, human trafficking, infliction of corporal injury to a cohabitant, and aggravated assault. The following evidence was presented at trial.[1]
A. N.F.
In 2009, Jordan began a relationship with N.F. and persuaded her to work for him as a prostitute. Jordan would drive N.F. to San Fernando, where she worked under rules he set. She had to remain in a certain area and could not speak with African-American males, and had to text Jordan before and after each sex act and charge specified amounts depending on how much time she spent with a customer. Jordan required that N.F. make $ 400 a day, after which he would pick her up. Jordan threatened to hurt N.F., her family, or her dog if she disobeyed, sometimes making good on those threats by beating her. For example, he once hit N.F. with a screwdriver when she looked at African-American males, purportedly a violation of one of his rules. Jordan coerced N.F. into chopping off her hair, and she had his name tattooed on her neck and wrist. He sometimes kicked her out of their residence or left her on the streets, often after beating her and taking her possessions. The relationship ended in 2014.
B. Julie T.
In December 2014, Jordan answered Julie T.'s ad on Craigslist seeking a "sugar daddy," and they exchanged emails and began a relationship, eventually moving in together. Jordan forced Julie to work as a prostitute. He drove her to working locations and dictated where she could walk, what text messages to send when she engaged a customer, what hotel rooms to use, how much time to spend with each customer, and how much to charge for each sex act. He would drive back and forth while she worked, monitoring her. Jordan forced Julie to work until she made $ 400. If she did not, or if she broke one of his rules, he beat her. On one occasion, Jordan struck Julie several times with a wooden brush, causing her to sustain a black eye and scratches on her forehead. On several other occasions he hit Julie in the face, leaving marks and bruises. Jordan coerced Julie to have his name tattooed on her chest and wrist, and demanded that she give him her income tax refunds and the financial aid money she received for attending technical school. Julie complied with his demands out of fear that he would beat her and destroy the ashes of her father and brother, which she kept in urns.
C. Arrest and Conviction
Jordan was arrested and charged with human trafficking ( Pen. Code, § 236.1, subd. (b) ), aggravated assault (§ 245, subd. (a)(4)), infliction of corporal injury to a cohabitant (§ 273.5, subd. (a)); pandering by procuring (§ 266i, subd. (a)(1)), and pimping (§ 266h, subd. (a)).
Before trial, the People moved in limine to exclude evidence that N.F. and Julie T. worked as prostitutes before they met Jordan. The court granted the motion on the ground that subdivision (b) of Evidence Code section 1161 (hereafter subdivision (b)) precludes admission of evidence of a human trafficking victim's history of commercial sexual *892 conduct. During trial, the court several times sustained prosecution objections aimed at excluding similar evidence.
N.F. testified that she and Jordan were in a relationship for five years, living in various motels. The relationship was good at first, and she loved him and agreed to work as a prostitute because they needed money. When asked whether she wanted to work as a prostitute, she testified, "Yes and no."
Julie testified she had posted ads on Craigslist.org asking for a "sugar daddy," which she claimed was a man who would pay a young woman for nonsexual companionship. She stated in the ad that she was a "good kisser" and "drug and disease free." She posted these ads on the "casual encounters" board at Craigslist, where, "the working girls post, ... like prostitutes." Julie admitted she used false names to obtain motel rooms for her and her "clients."
(Respondent's Notice of Lodging, Lodgment 6 at 2-5.)
Petitioner was sentenced to state prison for a term of twenty-one years and four months. He appealed his conviction to the California Court of Appeal, which affirmed the judgment, but modified the sentence to twenty-one years in state prison. (Lodgment 6.) The California Supreme Court subsequently denied petitioner's petition for review. (Lodgment 8.)
On December 12, 2018, Petitioner, who is represented by counsel, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Respondent filed an answer to the petition on January 28, 2019. (ECF No. 10 ) On March 5, 2019, petitioner filed a reply. (ECF No. 14.)
PETITIONER'S CLAIM
Petitioner alleges that he was deprived of his Sixth Amendment rights to confrontation and cross-examination by the trial court's exclusion of evidence that the victims worked as prostitutes before meeting Petitioner. (ECF No. 1 at 5.)
STANDARD OF REVIEW
A federal court may not grant a writ of habeas corpus on behalf of a person in state custody
with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d).
As used in section 2254(d)(1), the phrase "clearly established federal law" includes only the holdings, as opposed to the dicta, of Supreme Court decisions existing at the time of the state court decision. Howes v. Fields , 565 U.S. 499, 505, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012) (citing Williams v. Taylor , 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ).
Under section 2254(d)(1), a state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" about the correctness of the state court's decision. Harrington v. Richter , 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting Yarborough v. Alvarado , 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ). This is true even where a state court's decision is unaccompanied by an explanation. In such cases, the petitioner must show that "there was *893 no reasonable basis for the state court to deny relief." Harrington , 562 U.S. at 98, 131 S.Ct. 770. Review of state court decisions under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster , 563 U.S. 170, 180, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).
Under section 2254(d)(2), relief is warranted only when a state court decision based on a factual determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Stanley v. Cullen , 633 F.3d 852, 859 (9th Cir. 2011) (quoting Davis v. Woodford , 384 F.3d 628, 638 (9th Cir. 2004) ). Further, state court findings of fact - including a state appellate court's factual summary - are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) ; see Vasquez v. Kirkland , 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
Here, petitioner's claims were denied in reasoned decisions by the California Court of Appeal. The California Supreme Court then summarily denied review. Thus, the California Court of Appeal's decision constitutes the relevant state court adjudications on the merits for purposes of the AEDPA standard of review. See Berghuis v. Thompkins , 560 U.S. 370, 380, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (where state supreme court denied discretionary review of decision on direct appeal, the decision on direct appeal is the relevant state-court decision for purposes of the AEDPA standard of review).
DISCUSSION
1. Procedural background.
Prior to trial, the prosecution filed a motion to preclude the defense from cross-examining the victims regarding the sexual history, including their history of commercial sexual acts both prior to and after their relationships with Petitioner. (Lodgment 2 (Clerk's Transcript ["CT"] ) 239-242.) The prosecution's motion was made pursuant to section 1161(b) of the California Evidence Code which provides that "[e]vidence of sexual history or history of any commercial sexual act of a victim of human trafficking ... is inadmissible to attack the credibility or impeach the character of the victim in any civil or criminal proceeding."
During the hearing on the prosecution's motion, defense counsel argued that Petitioner had a constitutional right to cross-examine the victims about their sexual history. Defense counsel represented that both victims had multiple prior arrests for prostitution before they met Petitioner. According to defense counsel, this evidence was relevant to impeach the victims' testimony that Petitioner forced them to become prostitutes. It was also relevant to impeach Julie T.'s testimony that she was not familiar with a particular area because - according to defense counsel - Julie T. had been previously arrested in that area. Finally, defense counsel argued that prostitution was a crime of moral turpitude and therefore relevant to the victims' credibility which was "the only issue" in the case. (Lodgment 1 (Reporter's Transcript on Appeal ["RT"] 11-12.) The trial court ruled that section 1161(b) applied to the evidence that the two victims' had engaged in prior acts of prostitution and consequently, it was inadmissible. (RT 13-15, 17.)
2. Clearly established federal law.[2]
Petitioner alleges that the trial court's exclusion of the evidence deprived *894 him of his rights under the Confrontation Clause of the Sixth Amendment. The accused's right to confront witnesses, guaranteed by the Sixth Amendment, includes the right to cross-examine adverse witnesses to attack their general credibility or show their possible bias or self-interest in testifying. Olden v. Kentucky , 488 U.S. 227, 231, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (per curiam); see Delaware v. Van Arsdall , 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (the "main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination ") (quoting Davis v. Alaska , 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) ) (emphasis in original); Pennsylvania v. Ritchie , 480 U.S. 39, 51-52, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (the right to confront witnesses "includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable").
Despite this constitutional guarantee, trial judges retain wide latitude to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall , 475 U.S. at 679, 106 S.Ct. 1431. A trial court's restrictions on the defendant's right to cross-examine witnesses may not be "arbitrary or disproportionate to the purposes they are designed to serve" and may not prohibit all inquiry into the possibility that a witness is biased. Ortiz v. Yates , 704 F.3d 1026, 1034, 1035 (9th Cir. 2012) (quotations omitted) (citing Michigan v. Lucas , 500 U.S. 145, 151, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) ). Generally, the Confrontation Clause is satisfied when the defendant has the opportunity to show the weaknesses in a witness's testimony and undermine a witness's credibility. Hayes v. Ayers , 632 F.3d 500, 518 (9th Cir. 2011) ("No Confrontation Clause violation occurs 'as long as the jury receives sufficient information to appraise the biases and motivations of the witness.' ") (citations omitted).
Federal courts conduct a two-part inquiry to determine whether the exclusion of evidence violated a criminal defendant's Sixth Amendment rights. Ortiz , 704 F.3d at 1035-1036 ; Wood v. Alaska , 957 F.2d 1544, 1549-1550 (9th Cir. 1992). First, the court determines whether the evidence was relevant. Wood , 957 F.2d at 1550. More specifically, the court considers whether the proffered cross-examination sufficiently bore upon the witness's credibility "such that no fairminded jurist could disagree that the cross-examination could have influenced the jury's assessment of her." Ortiz , 704 F.3d at 1035-1036. Second, if the evidence is relevant, the court inquires whether the trial court's preclusion of this cross-examination was "unreasonable, arbitrary, or disproportionate in light of any countervailing interests justifying preclusion, such as waste of time, confusion, and prejudice." Ortiz , 704 F.3d at 1035 (citations and internal quotation marks omitted); see also Wood , 957 F.2d at 1550 (if excluded evidence is relevant, second part of inquiry under Confrontation Clause considers whether "legitimate interests outweighed [the defendant's] interest in presenting the evidence").
Finally, a violation of the Confrontation Clause is subject to harmless error analysis. Van Arsdall , 475 U.S. at 684, 106 S.Ct. 1431. Consequently, even when a trial court's exclusion of evidence amounts to a constitutional error, a petitioner is not entitled to federal habeas relief unless that error had a "substantial and injurious effect" upon the verdict. See Winzer v. Hall , 494 F.3d 1192, 1201 (9th Cir. 2007) (quoting *895 Brecht v. Abrahamson , 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ).
3. AEDPA review.
In rejecting Petitioner's Confrontation Clause claim, the California Court of Appeal began by setting forth the applicable federal law. For example, the state appellate court noted that the right to confrontation includes the right of cross-examination, but that the right was not absolute. (Lodgment 6 at 10-11 [citing, among other cases, Van Arsdall , 475 U.S. at 678-679, 106 S.Ct. 1431 and Chambers v. Mississippi , 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (any "significant diminution" of the right to cross-examine a witness "requires that the competing interest be closely examined.") ].) Applying the relevant law, the state appellate court reasoned as follows:
In Proposition 35, the voters recognized that human trafficking manifests "through the exploitation of another's vulnerabilities." (Text of Prop. 35, p. 101.) Here, any willingness on the part of N.F. and Julie T. to engage in commercial sexual activity left them vulnerable to exploitation by Jordan. "[T]o combat the threats posed by human traffickers ... seeking to exploit women ... for sexual purposes," the voters declared as an initial matter that trafficked individuals should be recognized "as victims and not criminals." (Ibid. )
Evidence of N.F.'s and Julie T.'s history of commercial sexual activity was excluded to protect them from further victimization and encourage them to testify without fear of harassment or condemnation. Although the evidence was arguably relevant to their credibility (see , e.g., People v. Clark (2011) 52 Cal.4th 856, 931 [131 Cal.Rptr.3d 225, 261 P.3d 243] ), the trial court could reasonably conclude the evidence would have led to confusion.
The danger of such confusion was patent, as evidenced by Jordan's arguments on appeal, where he argues that evidence of N.F.'s and Julie T.'s commercial sexual history was relevant to counter the inference that he "corrupted two innocent women," and "countered the inference that [they] engaged in prostitution only because of pressure from" him. But the women's "innocence" (whatever that means) was irrelevant. Human trafficking is the "[d]eprivation or violation of the personal liberty" of "another" with the intent to effect prostitution. ( Pen. Code, § 236.1, subd. (h)(3).) The law gives no attention to the victim's pre-trafficking conduct. (See People v. DeSantis (1992) 2 Cal.4th 1198, 1248 [9 Cal.Rptr.2d 628, 831 P.2d 1210] [evidence of specific instances of a complaining witness's sexual conduct is inadmissible to prove consent by the complaining witness on the instant occasion].) And we flatly reject any suggestion that a person who engages in prostitution does not deserve the protection of anti-trafficking statutes.
In a similar vein, at oral argument Jordan's counsel argued that the prosecution suggested incorrectly at trial that N.F. and Julie T. had not engaged in prostitution before they met Jordan. Therefore, he argued, evidence of their history of prostitution was necessary to counter this misimpression. The record contains no such suggestion by the prosecution in the first instance. From our reading, any resistance to the idea that N.F. and Julie T. had engaged in prostitution came only as pushback to Jordan's repeated and improper insinuations that they had. As just one example, when defense counsel asked Julie T. whether she knew that the Craigslist board where she posted her ads was also *896 used by prostitutes, she denied that her ads were offers of prostitution. A defendant may not by improper insinuation create circumstances necessitating - as rebuttal to the pushback - otherwise improper evidence.
Jordan's confrontation rights were not violated.
(Lodgment 6 at 11-12.)
A fair reading of the California Court of Appeal's opinion is that the court found the evidence of the victims' commercial sexual history was arguably relevant as acts of moral turpitude which could generally impeach their credibility, but not for any other purpose. Notably, in support of its statement that "arguably relevant to [the victims'] credibility," the state appellate court cited Clark , 52 Cal. 4th at 931, 131 Cal.Rptr.3d 225, 261 P.3d 243, which stands for the proposition that "a witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." Clark , 52 Cal. 4th at 931, 131 Cal.Rptr.3d 225, 261 P.3d 243. In the opinion's next paragraph - discussing the danger of confusion - the state court stated that evidence of prior commercial sex acts was not relevant to the substantive charges of human trafficking, which requires the defendant violate or deprive the victim of personal liberty. Thus, the state court found the proposed evidence of prior prostitution to be of limited relevance.
Next, the state appellate court considered the countervailing interests in excluding the evidence - namely, the likelihood of confusion and the potential prejudice to the victims who "deserve[d] the protection of anti-trafficking statutes" whether or not they engaged in prostitution. (Lodgment 6 at 11-12.) These are legitimate state interests that justify reasonable limitation on cross-examination. See, e.g., Lucas , 500 U.S. at 149-150, 111 S.Ct. 1743 (noting that rape-shield statutes are a "valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy."); People v. Phillips , 22 Cal. 4th 226, 234, 92 Cal.Rptr.2d 58, 991 P.2d 145 (2000) (recognizing that testimony from a witness about her acts of prostitution has an obvious potential for embarrassing or unfairly discrediting her, the "degrading impact of such questions has long been recognized," and because impeachment with such evidence is "highly prejudicial, and is properly excluded unless it is substantially outweighed by its probative value").
Thus, the state court weighed the legitimate state interests in avoiding confusion and prejudice against the probative value of the proffered cross-examination and determined that the exclusion of that evidence was not improper. See Lucas , 500 U.S. at 151, 111 S.Ct. 1743. The state court's determination in this regard was neither contrary to, nor an unreasonable application of, clearly established federal law. See Foy v. Gipson , 609 F. App'x 903, 906 (9th Cir. 2015) (state court's conclusion that excluding evidence did not violate the Constitution was not an unreasonable application of federal law because "[r]easonable jurists could differ concerning whether excluding evidence of the manner in which O. engaged in prostitution was 'arbitrary' or 'disproportionate to the purposes [California's rape shield laws were] designed to serve.' "); Farris v. Ryan , 2009 WL 256563, at *8 (E.D. Cal. Feb. 3, 2009) ("The trial court's preclusion of evidence under the Rape Shield Law was certainly not arbitrary or disproportionate, and the court's careful balancing of the parties' interests passes constitutional muster."), report and recommendation adopted , *897 2009 WL 807500 (E.D. Cal. Mar. 27, 2009), aff'd , 396 F. App'x 358 (9th Cir. 2010).
4. De novo review.[3]
In reviewing Petitioner's Confrontation Clause claim under a de novo standard, the Court first considers whether the excluded evidence was relevant - that is, whether Petitioner's proffered cross-examination of the victims would have influenced the jury's assessment of their credibility. See Ortiz , 704 F.3d at 1025. Petitioner's primary contention is that evidence that the victims engaged in prostitution prior to meeting Petitioner would have countered the inference that Petitioner "corrupted naïve victims and forced them into prostitution" and supported an inference that the victims voluntarily continued to perform commercial sexual activities. (Petitioner's Memorandum (ECF No. 6-1 ) at 22, 24.) Evidence that N.F. and Julie T. had previously engaged in prostitution, however, had no probative value in relation to the charges against Petitioner. Indeed, recognizing as much, federal courts "have routinely barred evidence of a sex trafficking victim's other prostitution activities." United States v. Haines , 918 F.3d 694, 697 (9th Cir. 2019) (citing United States v. Betts , 911 F.3d 523, 528-529 (8th Cir. 2018) ; United States v. Groce , 891 F.3d 260, 267-268 (7th Cir. 2018) ; United States v. Gemma , 818 F.3d 23, 34-35 (1st Cir. 2016) ; United States v. Lockhart , 844 F.3d 501, 510 (5th Cir. 2016) ; United States v. Elbert , 561 F.3d 771, 777 (8th Cir. 2009) ).
The Ninth Circuit's recent decision in Haines is particularly instructive. Haines was charged with sex trafficking and transporting a minor ("J.C.") to engage in prostitution. His defense was that
he was merely along for the ride and did not act as J.C.'s pimp. In support of that defense, he sought to question J.C. about her prior prostitution activities (which apparently did not involve a pimp), arguing that this evidence was relevant to, among other things, whether he recruited or encouraged her to engage in prostitution on this occasion. The district court excluded the testimony under Federal Rule of Evidence 412, the "rape shield" rule.
Haines , 918 F.3d at 696.[4]
Haines argued that excluding evidence of J.C.'s prior prostitution activities deprived him of his due process right to present a complete defense and his Sixth Amendment right to confront witnesses. In rejecting this argument, the Ninth Circuit relied upon cases involving adult victims forced or coerced into prostitution, which had concluded that evidence of other prostitution activity has little or no relevance. As the court explained, "just because a *898 victim agreed to engage in sex for money on other occasions does not mean she consented to, e.g., being beaten or having her earnings confiscated by the defendant." Haines , 918 F.3d at 697-98 (citing United States v. Rivera , 799 F.3d 180, 185-186 (2d Cir. 2015) ; United States v. Cephus , 684 F.3d 703, 708 (7th Cir. 2012).
Rivera , cited with approval in Haines , provides further guidance. In that case, the defendants were charged with sex trafficking and forced labor, among other crimes. Rivera , 799 F.3d at 184. At trial, they sought to cross-examine the victims about their work as prostitutes prior to the time they became involved with the defendants. The defendants "hoped to suggest that having already worked as prostitutes, the victims would not have been deceived by [the defendants] and that they 'knew ... what [they were] getting into.' " Rivera , 799 F.3d at 185. The trial court excluded the evidence pursuant to Rule 412 of the Federal Rules of Evidence. On appeal, the defendants argued that exclusion deprived them of their right to present a defense and to confront and cross-examine witnesses. The Second Circuit rejected the claim, explaining, "knowing that suggestive behavior or even sexual acts might become a part of the job does not mean that the victims therefore consented to being threatened or coerced into performing sexual acts they did not wish to perform. The very purpose of the Rule is to preclude defendants from arguing that because the victim previously consented to have sex - for love or money - her claims of coercion should not be believed." Rivera , 799 F.3d at 185. Finally, the court concluded that the fact that the victims may have been prostitutes before working for defendants did not suggest that the defendants did not later threaten them with violence to coerce them into commercial sex. Consequently, "there was no relevant use of the cross-examination testimony sought by [defendants] and the district court did not err in precluding it." Rivera , 799 F.3d at 186.
The same is true here. Petitioner asserts that evidence that the victims had been prostitutes when they met Petitioner was relevant because it "mitigated the inference that Petitioner corrupted innocent young women into living a seedy life they otherwise had no experience with or interest in." (Petitioner's Memorandum at 28.) However, evidence that N.F. and Julie T. had previously engaged in prostitution (and were not "innocent") is not probative of whether Petitioner deprived them of their liberty with intent to force them to work as prostitutes as defined by California Penal Code § 236.1. (See CT 299-301.) See United States v. Roy , 781 F.3d 416, 420 (8th Cir. 2015) ("At issue here is not recruiting an individual to engage in commercial sex for the first time, but doing an act with the use of force, threats, fraud, or coercion to cause the victim to engage in commercial sex. The victim's participation in prostitution either before or after the time period in the indictment has no relevance to whether Roy beat her, threatened her, and took the money she made from prostitution in order to cause her to engage in commercial sex."); United States v. Valenzuela , 495 F. App'x 817, 819-820 (9th Cir. 2012) ("Appellants cannot show the relevance of questions about prior prostitution to either Appellants' knowledge of the use of force, fraud, or coercion, or the victims' consent to work in prostitution."); Cephus , 684 F.3d at 708 ("[Defendants] wanted to suggest that having already been a prostitute she would not have been deceived by [Defendant] and therefore her testimony that she was coerced into working for him - an element of one of the charged offenses when the prostitute is not a minor, 18 U.S.C. § 1591(a) - should be disbelieved. But the testimony sought to be elicited by the cross-examination would *899 have been irrelevant. Even if no promises were made to [the victim], this would not be evidence that she consented to be beaten and to receive no share of the fees paid by the johns she serviced."). Petitioner's repeated assertions to the contrary are unavailing.[5]
Petitioner cites numerous cases in support of his claim, but all are plainly distinguishable. For example, Petitioner relies upon cases involving exclusion of evidence that the alleged victim of sexual abuse had made prior false accusations of sexual abuse. See Slovik v. Yates , 556 F.3d 747 (9th Cir. 2009), Fowler v. Sacramento County Sheriff's Dep't , 421 F.3d 1027 (9th Cir. 2005), and Averilla v. Lopez , 862 F.Supp.2d 987 (N.D. Cal. 2012). (Petitioner's Memorandum at 22-25.) The same is true of Holley v. Yarborough , 568 F.3d 1091 (9th Cir. 2009), a case on which Petitioner heavily relies. (Petitioner's Memorandum at 22-24.) The petitioner in Holley was charged with lewd and lascivious acts on a child under 14. He sought to impeach the victim's credibility by presenting testimony of two neighborhood children that the victim "had told them that she had done 'weird stuff' in a closet with her boyfriend, a term she also used to describe what [the petitioner] had done in rubbing her legs and breasts; that a neighborhood boy wanted to "hump her brains out"; and that her brother Matthew had once tried to have sex with her." Holley , 568 F.3d at 1096-1097. The Ninth Circuit concluded that the evidence "[d]iscrediting the accuracy and reliability of [the victim's] testimony could have shown a tendency to exaggerate or overstate, if not outright fabricate." Holley, 568 F.3d at 1099. Unlike the cases cited by Petitioner, evidence that N.F. and Julie T. had engaged in prostitution prior to Petitioner does not suggest that they had previously made false allegations against Petitioner.
Petitioner argues that the evidence was relevant to counter the prosecution's false portrayal of N.F. and Julie T. as naïve or innocent. The record, however, does not support this characterization of the prosecution's case. The evidence of prior prostitution would not have tended to undermine the prosecution's theory at trial. The record reveals that the prosecutor was careful to avoid questions that might open the door to evidence of the victims' characters or past acts. (See generally RT 461-472, 608-617, 643-684.) The prosecutor's closing argument focused on the trafficking charges and highlighted evidence that the prosecutor believed demonstrated that Petitioner exercised dominion over the victims - for example, by controlling their money and schedules and keeping them in a constant state of fear with violence and threats. (RT 1262-1268.) As the California *900 Court of Appeal noted, the record belied Petitioner's contention that the prosecution improperly suggested that the victims had not engaged in prostitution before meeting Petitioner. (See Lodgment 6 at 12.) Indeed, the prosecutor told the jury that it did not matter whether Julie T. already was a prostitute before Petitioner met her and conceded that there was evidence suggesting she might have been. (RT 1259-1260.)
Petitioner also contends that the evidence was relevant because it would have contradicted Julie T.'s testimony. Specifically, he points to Julie T.'s testimony that she was coerced to begin working as a prostitute for Petitioner the day after she met him. (Petitioner's Memorandum at 27.) At trial, defense counsel effectively and thoroughly cross-examined Julie T. about her explanation for how she wound up working as a prostitute for Petitioner. Among other things, defense counsel elicited extensive testimony that on the day Julie T. was allegedly coerced into working as a prostitute, she had friends and contacts, had a "big, beautiful apartment" and access to both money and her cell phone, yet she never called her mother, her friend, or the police and never told anyone that Petitioner, a man she had met the night before, was forcing her to work as a prostitute. (See RT 731-732, 739-744, 752-753.) When defense counsel asked Julie T. why she didn't tell her mother or her best friend/roommate about Petitioner forcing her to be a prostitute, Julie T. responded that she did not want to "stress them out." (RT 743-744.) In addition, defense counsel elicited testimony from the prosecution's expert witness undermining Julie T.'s testimony regarding how she began working as a prostitute for Petitioner. The expert testified that it was impossible for a person to be brainwashed into becoming a prostitute merely having dinner and getting her nails done. (RT 1010-1012, 1018-1021.) Thus, the credibility of Julie T.'s testimony about how she began working for Petitioner as a prostitute was subject to substantial challenge. At most, allowing evidence about her previous experience as a prostitute might conceivably explain the speed with which Julie T. began to work for Petitioner, but it would not have directly impeached her version of events.
Petitioner's Memorandum identifies several other inconsistencies in Julie T.'s testimony. For example, Julie T. testified that she had her tax refund deposited directly into Petitioner's account. But Detective Zamora testified that petitioner's bank account statements did not reflect such a deposit. Detectives Zamora also testified that Julie T. had told the police that Petitioner was a "John" rather than her pimp. The evidence Petitioner cites, however, was presented to the jury, and defense counsel was free to - and did - argue that they rendered Julie T.'s testimony unreliable. (See RT 1273-1275, 1280.) In any event, Petitioner fails to explain how Julie T.'s inconsistent testimony on other topics alters the analysis of the probative value of her prior acts of prostitution.
Finally, Petitioner points out that under California law, prostitution is a crime of moral turpitude and that acts of moral turpitude are admissible to impeach the credibility of a witness. (Petitioner's Memorandum at 19-20 (citing Clark , 52 Cal. 4th at 931, 131 Cal.Rptr.3d 225, 261 P.3d 243 ; People v. Chandler , 56 Cal. App. 4th 703, 708, 65 Cal.Rptr.2d 687 (1997) ).) Therefore, Petitioner reasons that the prior prostitution evidence was admissible to impeach the credibility of N.F. and Julie T. by showing that they "voluntarily and completely on their own engaged in ongoing acts of moral turpitude." (Petitioner's Memorandum at 24.)
*901 Assuming that evidence of prior prostitution generally impeaches the victims' credibility, in this case, it would have added little to the evidence already before the jury. The jury heard substantial evidence impeaching the victims' credibility as well as evidence from which it could infer that the victims had been prostitutes prior to meeting Petitioner. For example, (i) defense counsel elicited Julie T.'s testimony that she posted numerous ads in the casual encounters area of Craigslist, and Julie T. explained that the casual encounters area is where working girls "like prostitutes" post ads; (ii) in the ad which Petitioner answered, Julie T. had represented that she was looking for a sugar daddy, she was "disease free," and she was a "good kisser"; (iii) Julie T. told the police that Petitioner was a "John" or a "trick" rather than her pimp; (iv) Julie T. used numerous fake names; researched victim's compensation in relation to her allegations against Petitioner; (v) she collected financial aid for college even though she only attended for one month; and (vi) she collected welfare funds for her children even though her children lived out of state with her mother. (RT 690, 694-700, 703-704, 765-766, 802-803, 904-908.) With respect to N.F., defense counsel elicited testimony that (i) she had willingly gotten tattoos of not only Petitioner's name but other men's' names as well; (ii) she acted as a step-mother to Petitioner's daughter, attended school functions and birthday parties, and had a close relationship with Petitioner's mother; and (iii) she had never told the police that Petitioner had victimized her until she was subpoenaed. (RT 621-626, 632-633.)
In addition, defense counsel argued to the jury:
[Julie T.] had multiple postings [in] multiple places looking for people to trick and take advantage of. And counsel jumped up and down when we tried to talk about prostitution. And finally they copped to, okay they [the victims] are prostitutes. It is not what they said in opening statements.... They said my client was a predator. I haven't seen a person who was preyed upon. They literally tried to keep from you [that the victims] were ongoing, working prostitutes.
(RT 1276.) Defense counsel further argued that the victims were not credible because they had engaged in prostitution:
These are people who prey on your people, on your father, on your friend. And why in the world did we get to the point where - ... when did it become okay to sell sex? When did they become believable? I know it is the oldest profession in the world. I have got it. I'm not naïve.
(RT 1280.)[6]
In sum, defense counsel was able to extensively cross-examine both victims and elicited substantial impeaching testimony. Indeed, he elicited enough evidence to allow him to argue that the victims were prostitutes, and the prosecution essentially conceded that they were. Thus, it is not reasonably likely that the jury would have received a significantly different impression of the credibility of either N.K. or Julie T. had the additional allegedly impeaching evidence been admitted. See Van Arsdall , 475 U.S. at 680, 106 S.Ct. 1431. As such, exclusion of the evidence did not violate the Confrontation Clause. See Hayes , 632 F.3d at 518 (no Confrontation Clause violation when excluded evidence had low probative value and jury had sufficient *902 information to appraise bias and motivation of witness); Farris , 2009 WL 256563, at *8 (although evidence that victims were prostitutes could impeach their character, exclusion did not violate the Constitution where the additional impeachment value of misdemeanor prostitution activities was minimal, where defense counsel argued to jury that the victims were acting as a prostitutes at time of alleged offenses and prosecutor "basically argued that it didn't matter whether the victims were prostitutes or not").
The second factor identified in Ortiz also supports the conclusion that exclusion of the evidence did not violate Petitioner's constitutional rights. In the circumstances of this case, legitimate countervailing interests reasonably justified the trial court's curtailment of cross-examination. Ortiz , 704 F.3d at 1026. As the California Court of Appeal explained, "[e]vidence of N.F.'s and Julie T.'s history of commercial sexual activity was excluded to protect them from further victimization and encourage them to testify without fear of harassment or condemnation." (Lodgment 6 at 11-12.) The interests of protecting trafficking victims and encouraging them to testify reflect valid legislative determinations justifying exclusion of evidence that the victims had engaged in prostitution prior to meeting Petitioner. See, e.g., Lucas , 500 U.S. at 149-150, 111 S.Ct. 1743 (noting that rape-shield statutes are a "valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy."). Considered in combination with the limited probative value of the evidence in this case, its exclusion did not violate the Confrontation Clause.
Finally, considering all of the foregoing, any error in excluding cross-examination regarding the victims' prior prostitution activity did not have a substantial and injurious effect on the jury's verdict. See Berry v. Davey , 2017 WL 7310097, at *9 (C.D. Cal. Oct. 25, 2017) (in light of the significant impeachment evidence admitted, exclusion of additional cross-examination of victim/witness did not deny the jury sufficient information to assess victim's credibility, and hence did not violate the Confrontation Clause and, for the same reason, exclusion of additional inquiry was harmless under Brecht ), report and recommendation adopted , 2018 WL 671153 (C.D. Cal. Jan. 31, 2018).
Accordingly, Petitioner is not entitled to relief.
* * *
RECOMMENDATION
For the foregoing reasons, it is recommended that the District Judge issue an Order: (1) accepting and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the petition and dismissing this action with prejudice.
DATED: 3/26/2019

Independent review of the record confirms that the California Court of Appeal fairly and accurately summarized the evidence presented at trial. Accordingly, the Court adopts the state court's summary of the evidence. See Slovik v. Yates , 556 F.3d 747, 749 n.1 (9th Cir. 2009) (factual summary set forth in opinion of state court of appeal is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1) ).

Respondent's contention that Petitioner's claim does not present a cognizable federal question (ECF No. 10 at 12-15 ) lacks merit.

In the interest of a complete record and analysis, the Court undertakes de novo review as an alternative to the AEDPA review discussed in the preceding section.

Rule 412 of the Federal Rules of Evidence, provides that, with limited exceptions, evidence offered to prove that a victim engaged in other sexual behavior or to prove a victim's sexual predisposition is not admissible in a civil or criminal proceeding involving alleged sexual misconduct. One of the limited exceptions to the rule is if exclusion of the evidence would violate the defendant's constitutional rights. Like California Evidence Code § 1161, Rule 412 was enacted to protect alleged victims of sexual misconduct. See Fed. R. Evid. 412, Advisory Committee Note ("The rule aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process. By affording victims protection in most instances, the rule also encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders.").

Petitioner does not address each of the charges against him separately. Instead, he apparently limits his claim to the human trafficking charges. Nevertheless, the Court notes that the foregoing reasoning applies equally to each of the remaining charges. That is, evidence that N.F. and Julie T. had previously engaged in prostitution was not relevant to: the offense of aggravated assault, which requires that the defendant assault the victim by means of force likely to produce great bodily injury (Cal. Penal Code § 245(a)(4) ; CT 306); willful infliction of corporal injury upon a cohabitant, which requires that the defendant cause bodily injury to the victim (Cal. Penal Code § 273.5(a) ; CT 302-303); the offense of pimping, which requires that the defendant, knowing another person is a prostitute, lives or derives support of maintenance in part from the earnings of the other person's prostitution (Cal. Penal Code § 266h(a) ; CT 297-298); or the offense of pandering by procuring, which requires that the defendant procure another person for purposes of prostitution by "promises, threats, violence or any device or scheme" and with the specific intent to "influence another person to become or continue to be a prostitute." (Cal. Penal Code 266i(a)(1) ; CT 295-296.)

In rebuttal, the prosecutor argued that defense counsel wanted the jury not to believe the victims because "he is hoping - he is banking on nobody caring because, after all, they are just prostitutes. You can have sex with them for money and nobody cares. You can abuse them and no one cares...." (RT 1306.)